Filed 11/17/20  P. v. Griffin CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D074956 |
| Plaintiff and Respondent, | (Super. Ct. No. SCD267344) |
| v. | ORDER MODIFYING OPINION |
| AARON LEN GRIFFIN, | |
| Defendant and Appellant. | NO CHANGE IN THE JUDGMENT |

THE COURT:

It is ordered that the opinion filed on October 21, 2020, be modified as follows:

On page 4, replace the fourth full paragraph with:

"A crime scene specialist recovered a gun and numerous nine-millimeter bullets and cases from the Pontiac.  She also collected six Winchester .45 caliber cartridge cases from the left-hand turn lanes of Euclid."

On page 5, replace the second full paragraph with:

"Nine-millimeter cases and a Glock were found in the Pontiac.  A criminologist testified that the Glock fired all the nine-millimeter cases."

There is no change in the judgment.

McCONNELL, P. J.

Copies to:  All parties

Filed 11/5/20  P. v. Griffin CA4/1 (unmodified)
(unmodified opinion attached)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>AARON LEN GRIFFIN,<br><br>    Defendant and Appellant. | D074956<br><br>(Super. Ct. No. SCD267344)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN THE JUDGMENT |

THE COURT:

It is ordered that the opinion filed on October 21, 2020, be modified as follows:

On page 4, the fourth full paragraph, replace the first sentence with:

"A crime scene specialist collected a gun and six Winchester .45 caliber cartridge cases from the left-hand turn lanes of Euclid."

There is no change in the judgment.

Appellant's petition for rehearing is denied.

McCONNELL, P. J.

Copies to:  All parties

Filed 10/21/20  P. v. Griffin CA4/1 (unmodified opinion)
### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>AARON LEN GRIFFIN,<br><br>    Defendant and Appellant. | D074956<br><br><br>(Super. Ct. No. SCD267344) |

APPEAL from a judgment of the Superior Court of San Diego County, Louis R. Hanoian, Judge.  Affirmed.

Gregory L. Rickard, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

A shootout between two drivers at the intersection of Euclid and Market on May 17, 2016, left driver Jamar J. dead.  Police traced the other vehicle to defendant Aaron Griffin and charged him with first degree murder

(Pen. Code,[1] § 187, subd. (a)), assault with a semi-automatic firearm (§ 245, subd. (b)), and shooting at an occupied vehicle (§ 246). Police also charged Griffin with shooting at an inhabited dwelling (§ 246), for an incident that occurred 10 days earlier when someone in a white SUV fired several shots into a family residence on Balmoral Drive, damaging the home of Jamar's next door neighbor. At trial, Griffin argued that there was no evidence linking him personally to the residential shooting and that he fired his weapon at the intersection of Euclid and Market that May day in self-defense. The jury convicted Griffin on all charges, and he was sentenced to seven years eight months, plus 50 years to life. The court also imposed a $10,000 restitution fine and various fees and assessments.

Griffin appeals the judgment contending he suffered prejudice (1) due to prosecutorial misconduct that occurred during closing arguments, (2) because the court used standard jury instruction CALCRIM No. 224, and (3) because he was issued several fines, fees, and assessments without an ability-to-pay hearing. Griffin did not object to any of these alleged errors at the time of trial or sentencing. We conclude he has forfeited the prosecutorial misconduct and jury instruction challenges, as well as the challenge to the imposition of fines, fees, and assessments without an ability-to-pay hearing. Accordingly, we will affirm.

BACKGROUND AND PROCEDURAL FACTS

A. *Shooting on Balmoral Drive*

Around 3:00 a.m. on the morning of May 17, 2016, gunshots woke residents of a house on Balmoral Drive. Multiple bullets hit the house, with two bullets firing through a window and a wall. There were also bullet holes

---

[1] Further unspecified section references are to the Penal Code.

2

found in the resident's car. Police recovered six .45 caliber Winchester casings at the scene.

A neighbor saw a stocky male, about five foot nine or ten inches tall, walking east on the sidewalk with a gun in his left hand, firing three shots toward the house. Another neighbor saw a white "boxy-type" SUV speeding away from the home.

The occupants had no idea why someone would shoot at their home or family. However, the next door neighbor had a five-month-old child with Jamar, who was living with her, and Jamar was a known West Coast Crips gang member.

B. *Shooting at Intersection of Euclid and Market*

Ten days later, Jamar was shot and killed at the intersection of Euclid and Market. On May 27, 2016 around 1:00 p.m., Jamar was stopped in the first left-turn lane facing south on Euclid at the intersection of Euclid and Market, where there are four southbound lanes. He was driving a white Pontiac, with his infant child in a car seat in the back. Griffin was at the same intersection, in the second left-turn lane, driving a white Jeep;[2] he was accompanied by a Black female passenger in the front seat.

Witnesses heard gunshots. Several saw smoke and bullet casings come from the white Jeep. One saw glass falling down into the street. No one saw who pulled out a weapon first or who fired the first shots. When the shooting stopped, the Jeep turned to the right, past the Pontiac, and drove onto

---

[2] Kimberly L. testified the Pontiac was in the number two lane, and the Jeep was in the first lane, to the left of the Pontiac. However, the other witnesses testified the Pontiac was in the first lane, and the Jeep was to the right of the Pontiac.

Market.  A witness testified there were two Black occupants who were ducked down in the vehicle.

The Jeep pulled into a small shopping center at 47th and Market.  A Black woman exited the front passenger side of the vehicle and ran toward 47th Street while the vehicle drove off.

The Pontiac rolled slowly into the intersection and came to a stop at the curb.  Kimberly L. and Tia S., who were in the first vehicle in the lane farthest to the right, ran to the Pontiac, where they found a bleeding man slumped between the two front seats; his arm was reaching toward the backseat, where the baby was.  Kimberly saw a gun on Jamar's lap.  Tia put the Pontiac into park, unbuckled the child seat, and removed the child.  She noticed gunshot damage on the passenger side of the Pontiac.  Another witness, Ismail D. also noticed a lot of bullet holes in the car near the car seat.

C. *Initial Police Investigation*

When San Diego Police Sergeant Anthony Breise arrived, he found Jamar in the vehicle, bleeding, with his right hand outstretched and a gun that appeared to be a Glock next to it.  He checked for a pulse but could not find one.  There were seven "defects" from bullets in the Pontiac.

A crime scene specialist collected a gun and six Winchester .45 caliber cartridge cases from the Pontiac.  She also recovered numerous nine-millimeter bullets and casings from the Pontiac.

D. *The White Jeep*

Police found a white Jeep parked in front of a residence about a mile from the intersection.  Nearby residences housed Neighborhood Crip gang members or close associates.  The Jeep had bullet holes in the windshield and the driver's side door, and the left rear tire was deflated.  Police traced the

4

vehicle to a rental car company and learned the vehicle had been rented by Griffin on May 5, 2016.

When police searched the Jeep, they discovered clothing and personal property in laundry baskets and miscellaneous bags in the back. Police recovered a black ski mask from the front seat area.

E. *Bullet Analysis*

Nine-millimeter casings and a Glock were found in the Pontiac. A criminologist testified that the Glock fired all the casings recovered at the intersection.

Sergeant Christopher Leahy, a homicide detective assigned to investigate, testified that all the .45 caliber Winchester casings he recovered from the shootout at the intersection were fired by the same gun. A database search for the .45 caliber casings found that the same gun was used in three other crimes, two in 2015 and one in 2016, though no other information connected Griffin to those incidents. One of the victims of a previous shooting was a Neighborhood Crip member.

A ballistics expert examined the six .45 caliber casings from the Balmoral Drive shooting and discovered the same gun fired all six cartridges. The database showed that the cartridges matched those from the gun used in the May 27, 2016 shooting of Jamar.

F. *Bullet Trajectories*

A criminologist conducted a reconstruction to estimate the path of the bullets during the shooting. She did this by measuring bullet holes, entry and exit holes, identifying where cartridge casings fell, and inserting trajectory rods into the bullet holes. She provided a diagram of the positioning of the Pontiac and Jeep at the time of the shooting, which showed the Jeep slightly behind the Pontiac. Some of the shots fired from the Jeep

5

into the Pontiac entered the rear passenger side of the Pontiac through the window or rubber stripping around the window. Two entered through the front passenger seat and one hit the top edge of the car seat. This indicated the Jeep was positioned somewhat behind the Pontiac because the shots into the Pontiac came from the rear into the driver's seat. The criminologist also testified that at some point during the shootout the cars could have been side by side, but she did not have evidence in terms of bullet holes to support that.

She explained on cross-examination that she could not tell the exact positions of the vehicles at the start of the shootout. Her reconstruction also could not determine who fired first or the sequence of shots. She acknowledged it would have been possible for the vehicles to have been side-by-side when the first shots were fired if the initial shots fired did not hit either vehicle.

G. *Gang Evidence*

Griffin is an active member of the Neighborhood Crips. Jamar was an active West Coast Crips gang member. The Neighborhood Crips and the West Coast Crips are traditional allies, or sister gangs. San Diego Police Department gang unit Detective Jack Schaffer testified respect and disrespect are important among gang members, and personal issues among allied gangs would spark rivalries, which could escalate to violence. If a gang member were disrespected, retaliation would be necessary to earn back respect from others.

Detective Schaffer had not heard of any problems between the two gangs immediately prior to the shootout, but following Jamar's death there was violence between the West Coast Crips and the Neighborhood Crips, with individuals from both gangs losing their lives.

6

Sergeant Leahy testified that respect is a huge part of gang culture, and if a gang member feels he has been disrespected, others in his gang will retaliate against the offending person. However, when he was asked whether a gang member who shot at an allied gang member's house would expect to be retaliated against, he said that would not be the expectation; the leaders of the gangs would have to give permission or sanction some sort of retaliation.

On cross-examination, defense counsel asked Sergeant Leahy about an alleged altercation between Griffin and Jamar. Sergeant Leahy testified that a gang member informant told him the informant heard from a third person that a fourth person was present when there was an altercation between Griffin and Jamar in which Griffin had pulled a gun on Jamar and threatened him. After others intervened to deescalate the situation, Jamar said to Griffin, "The next time I see you, I'm going to . . . kill you," or something to that effect. The detective did not follow up with the third person, but he attempted to follow up with other individuals whose names had been provided; none of those individuals would speak with police. He did not believe the story was an accurate reflection of what had occurred because it was a rumor.

H. *Autopsy*

The autopsy described the manner of death as homicide caused by a gunshot wound to the chest. Jamar also had a gunshot wound to his right bicep, and a projectile was recovered from the shoulder blade area of his back.

I. *Cellular Phone Evidence*

Criminal Intelligence Analyst Peter Villaver testified regarding cell phone data. He used a visual representation to show jurors cell towers

7

activated by Griffin's phone the day of shootout, from 11:00 a.m. to 3:00 p.m.[3] The visual representation included two locations: the intersection at Euclid and Market, and the residence where the Jeep was found. He explained cell tower information was based on activity generated from voice calls and text messages; they could not pinpoint a phone's exact location, only general whereabouts. Cell tower information also did not indicate who was in possession of the cell phone.

If a cell phone is moving, it can transact with one cell tower or switch to another cell tower or a number of cell towers. Griffin's phone consistently activated the same general towers between 11:00 a.m. and 12:00 p.m., indicating the phone was in the East Village neighborhood during that time.

The first activity occurred at 12:09 p.m., in the East Village. At 12:16 p.m., the cell phone activated a cell site in the area of Market Street and Interstate 15. At 12:19 p.m. and 12:23 p.m., Griffin's cell phone hit a tower in the Oakpark neighborhood. At 12:28 p.m., the phone was detected by a tower in the general area of Euclid and Market. The phone was detected by that same tower at 12:32 p.m., 12:39 p.m., and 12:56 p.m. There were additional detections in the same general neighborhood between 1:00 p.m. and 1:15 p.m. From 1:15 p.m. to 2:00 p.m., there were multiple hits to towers in the Fairmont Park and Oakpark areas, near where Interstates 805 and 15 cross. Villaver testified that there was one activation in the Golden Hill area during that same period, but because it occurred in the midst of back and forth activities, it appeared the tower near Golden Hill was the best to provide service, but the phone was likely in the Fairmont Park or Oakpark

---

[3]    Some of the cell phone tower activations indicated antenna directionality, and others did not.

area. Based on the saturation of cell towers, the phone was moving to the northwest away from the Market and Euclid intersection.

On cross-examination, defense counsel clarified with Villaver that the precise location of the phone could not be identified at any given activation, and that there was a range of area in which the phone could have been located.

J. *Charges and Closing Arguments*

Griffin was charged with the murder of Jamar (§ 187, subd. (a); count 1), along with allegations of personal use and discharge of a handgun, proximately causing great bodily injury, within the meanings of section 12022.5, subdivision (a), and section 12022.53, subdivisions (b), (c), and (d). He was also charged with assault with a semi-automatic firearm on the five-month old (§ 245, subd. (b); count 2), as well as an allegation of personal use of a handgun (§ 12022.5, subd. (a)); shooting at an occupied motor vehicle (§ 246; count 3), as well as discharging a handgun (§ 12022.53, subd. (d)); and shooting at an inhabited dwelling (§ 246; count 4). He was also charged with two prison priors.

In closing, the prosecutor argued Griffin had committed first degree murder both because he had waited at the intersection to attack Jamar and because he fired from a vehicle. To support his first theory, the prosecutor relied on the cell phone evidence and commented on the presence of a ski mask recovered from the Jeep, as well as the possession of the gun used to kill Jamar. He argued Griffin had hunted Jamar and explained why self-defense could not justify Griffin's actions.

Griffin's primary defense was that the killing was justified because he acted in self-defense. As part of this theory, the defense argued that Griffin's passenger was his wife, Maria, whom he married April 11, 2016. The defense

9

argued it was unlikely Griffin would have been lying in wait with his new wife in the car.

K. *Verdicts and Sentencing*

The jury found Griffin guilty on all counts and found true each allegation. The court sentenced Griffin to 50 years to life for count 1, but it struck the punishment on prison priors under section 667.5, subdivision (b). It imposed six years for count 2 (§ 245, subd. (b)), seven years for count 3 (§ 246), stayed pursuant to section 654, and an additional year and eight months consecutive for count 4 (§ 246). It imposed four years for the use of a firearm in connection with count 2 (§ 12022.5, subd. (a)), which it then struck. The sentence was for a total of seven years eight months plus 50 years to life.

The court also imposed a restitution fine for $10,000 (§ 1202.4, subd. (b)), a parole revocation fine of $10,000, stayed, (§ 1202.45), a court security fee of $160 (§ 1465.8), a criminal conviction assessment of $120 (Gov. Code, § 70373), a criminal justice administration fee of $154 (Gov. Code, § 29550), and victim restitution of $5,600 (§ 1202.4, subd. (f)) to which Griffin stipulated.

Griffin timely filed this appeal November 9, 2018.

In April 2019, citing section 1237.2, Griffin filed an informal motion in the trial court for correction of fines and fees, arguing that the imposition of these fines and fees without a hearing violated his due process rights. The motion requested a stay of the restitution fines and reversal of the remaining fees pending a finding that the State had proved Griffin had an ability to pay. The court denied the motion in May 2019, noting Griffin had forfeited the issue of inability to pay by failing to raise it at sentencing. The trial court's order noted that Griffin could have raised the issue with respect to the restitution fine above the $300 mandatory minimum (§ 1202.4, subd. (d)) and

10

the criminal justice administration fee (Gov. Code, §§ 29550, subd. (d)(2), 29550.2, subd. (a).)

## DISCUSSION

## I

## PROSECUTORIAL MISCONDUCT

Defendant contends the prosecutor engaged in misconduct by deceiving and misleading jurors during closing arguments. He bases these claims on the prosecutor's statements that defendant sat at the intersection for over half an hour waiting for the victim to appear, so he could attack and the prosecutor's reference to a ski mask discovered in the front seat of Griffin's vehicle. He also argues it was prosecutorial misconduct to reference the parties' gang involvement, and he maintains the prosecutor improperly directed the jury to consider the broader societal message of a guilty verdict.

A. *Forfeiture*

As a preliminary matter, we agree with the Attorney General that defendant forfeited his claim of prosecutorial misconduct because he failed to " 'make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.' " (*People v. Clark* (2011) 52 Cal.4th 856, 960, quoting *People v. Cole* (2004) 33 Cal.4th 1158, 1201 (*Cole*); see also *People v. Dennis* (1998) 17 Cal.4th 468, 521 (*Dennis*).)

B. *Specific Instances of Prosecutorial Misconduct*

Even were we to conclude the defendant's claims were properly before us, we would conclude they fail on the merits. "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair

11

trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" (*Cole*, *supra*, 33 Cal.4th at p. 1202.)

Referring to facts not in evidence constitutes misconduct because it tends to make a prosecutor his or her own witness, " 'offering unsworn testimony not subject to cross-examination.' " (*People v. Hill* (1998) 17 Cal.4th 800, 828, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) However, "[p]rosecutors have wide latitude to discuss and draw inferences from the evidence at trial" (*People v. Lucas* (1995) 12 Cal.4th 415, 473 (*Lucas*)), and we "view the statements in the context of the argument as a whole" (*Cole*, *supra*, 33 Cal.4th at p. 1203). It was for the jury to determine whether those inferences were reasonable. (*Lucas*, at p. 474.)

    1. *Cell Phone*

        a. Additional Facts

The prosecutor told the jury Griffin's phone pinged near the intersection starting at 12:28 p.m. He said Griffin's phone activated "those towers right there at that intersection," and he offered an inference that because the phone pinged off the same towers for the next 30 minutes, it meant "[t]he defendant waited at Market and Euclid for 30 minutes." He argued: "We didn't hear any evidence that he lives by there. He was staying by there. It looks like they're living out of the Jeep." In rebuttal, in the context of explaining this was a situation of mutual combat or that Griffin sought out the victim, he said, "Mr. Griffin waited, waited at that intersection for [Jamar] with a gun and a ski mask and executed Jamar . . . , and that is not a killing that is justified under the law."

12

b. Analysis

Griffin contends the prosecutor's use of cell phone evidence during his closing argument relied on evidence not admitted. The prosecutor's cell phone argument was based on the theory that Griffin sought out the victim, first at his home on Balmoral Drive, then later at the intersection of Market and Euclid.

The prosecutor inferred that the cell tower records showed Griffin remained at the intersection of Euclid and Market because the phone activations indicated he remained in the same area at 12:32, 12:39, and 12:56 p.m., the 30 minutes immediately preceding the shootout. He asked the jury to likewise infer the cell tower evidence placed Griffin at the scene, waiting for the opportunity to kill the victim. Whether the prosecutor's inference was reasonable was a question for the jury to decide. (See *Lucas*, *supra*, 12 Cal.4th at p. 474.) While the challenged remarks may have been hyperbolic, we cannot say they were based on evidence outside the record or that they were misleading. (See *Dennis*, *supra*, 17 Cal.4th at p. 522.) Accordingly, this did not rise to the level of prosecutorial misconduct.

2. *Ski Mask*

The prosecutor referred to the presence of a ski mask in Griffin's car as evidence Griffin was planning an attack on Jamar, telling the jury the mask was sitting in the front of the car "at that intersection for 30 minutes." Griffin maintains this was improper because it went beyond inferences reasonably warranted by the evidence.

Griffin argues that ski masks are associated more frequently with robberies than with shootouts; he explains that the shooter here was in a car rented in his own name, eliminating the need to obfuscate his identity, and he notes that no witnesses described anyone in the vehicle as wearing a mask

13

at the scene of the crime. This boils down to a battle of inferences; Griffin offers on appeal an alternative inference that could explain the mask. This does not make the inference offered by the prosecution an unreasonable one; nor does it mischaracterize the evidence or implicate misconduct in some other way. Moreover, the prosecutor is not prohibited from using multiple pieces of evidence to draw an inference.[4] (*People v. Lewis* (1990) 50 Cal.3d 262, 283 [prosecutor has right to fully state his views of what the evidence shows].) Here the prosecution used Griffin's location based on cell tower evidence in conjunction with the mask to infer Griffin had planned an attack. It was up to the jury to decide whether the prosecutor's inferences were reasonable. (See *Lucas*, *supra*, 12 Cal.4th at p. 474; *Lewis*, at p. 283 [jury decides if deductions are logical].)

C. *References to Gangs in Closing*

Griffin further contends the prosecutor engaged in misconduct because he referenced the parties' gang affiliations in a manner aimed at arousing juror's passions. He specifically challenges the prosecutor's statements that "you cannot create a gang war zone in an intersection in San Diego and have

---

[4] Griffin separately argues the cell phone and ski mask arguments were necessary because evidence regarding the relative positions of the two vehicles during the shootout was weak. Having already explained that the challenges to those arguments were forfeited and not improper *supra*, the reason for emphasizing that evidence seems unimportant. However, we note that there was independent evidence to support the prosecutor's claim that Griffin fired bullets from the Jeep while it was positioned slightly behind the Pontiac: The criminologist opined that because several shots entered the Pontiac through the right rear passenger side, the Jeep was positioned somewhat behind the Pontiac. Although she acknowledged the vehicles could have been side-by-side at some point during the shootout, she also explained that were that to have been the case when the shootout began, it would have meant the initial shots fired went through open windows, implying neither vehicle or person was hit.

14

it be justified" and "[g]ang members are not allowed to declare war, create a gang war, and create a shootout in a busy San Diego intersection."

"When the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citations.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 244 (*Harrison*).) Prosecutors have wide latitude during closing argument to argue vigorously, including by offering reasonable inferences and deductions. (*Ibid.*) We will not reverse a conviction for prosecutorial misconduct "unless it is reasonably probable a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839 (*Crew*).)

Griffin's attorney argued that the case was all about "prosecuting the survivor," that Griffin was being hunted by the victim, and that Griffin responded in self-defense. The prosecutor's statements challenged this view in two ways. First, the prosecutor argued Griffin hunted the victim; thus, Griffin's actions were not justified because they were not an act of self-defense. Second, the prosecutor contradicted Griffin's self-defense theory by arguing that at best the two men had engaged in mutual combat. In this context, the prosecutor's statements were an explanation for why mutual combat could not justify a self-defense claim, not broad commentary in support of public safety.

Griffin also maintains the prosecutor engaged in misconduct by arguing facts not in evidence because the men were from allied gangs, not rival gangs. But the prosecutor's statements do not reference the relationship between the gangs at all, and Detective Schaffer testified that there had been times when the relationship between the gangs was not good and there would be a "little

15

feud," usually a fistfight, as a result of something personal between allied gang members. He also explained that following the victim's death, things were violent between the two allied gangs for a couple months, with individuals from both sides losing their lives, which demonstrates that their gang's status as allies did not preclude violence. Thus, we cannot say these comments demonstrated misconduct.

Moreover, even if these comments crossed the line to misconduct, we find it unlikely that jurors would have applied the remarks in an objectionable fashion. (See *Harrison*, *supra*, 35 Cal.4th at p. 244.) There was no dispute that the two participants in the shootout were gang members or that the defendant's bullets killed the victim at the intersection. And there was no dispute that Griffin fired from his vehicle the shot that killed the victim. The only issue was related to Griffin's intent, which the jury could determine by contemplating the sequence of events and whether the two men were engaged in mutual combat. Under these circumstances, it is not reasonably probable that the reference to gangs in closing argument impacted the jury's determination regarding whether Griffin's actions met the requirements for first degree murder. (See *Crew*, *supra*, 31 Cal.4th at p. 839.)

As we previously noted, even if these various statements Griffin now complains of were to have risen to the level of misconduct, none of them was so serious that an objection and admonition would have been inadequate to cure the harm; thus, the argument is forfeited. (*People v. Wharton* (1991) 53 Cal.3d 522, 566 (*Wharton*).) Finally, the trial court instructed the jury that arguments were not evidence, and that it was up to the jury to decide facts based on evidence. (See CALCRIM Nos. 200 & 222.) We presume the jury

understood and followed these instructions.  (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1178.)

D. *Ineffective Assistance of Counsel*

Griffin argues in the alternative that the failure to object constituted ineffective assistance of counsel.  To demonstrate ineffective assistance of counsel, Griffin must show his attorney's performance (1) fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defense.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.)  We evaluate counsel's conduct with deference and "indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance." (*Dennis*, *supra*, 17 Cal.4th at p. 541.)  " ' "[If] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citation.]" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) We presume defense counsel rendered adequate assistance (*People v. Ledesma* (1987) 43 Cal.3d 171, 215).  Moreover, " 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence.' [Citation.]" (*Wharton*, *supra*, 53 Cal.3d at p. 567.)

There were tactical reasons that could explain why defense counsel did not object to various prosecution arguments.  He could have opted not to focus on whether defendant was near the intersection before the shootout, the meaning of the mask, or the comments about gang violence because he wanted to ensure the jury focused on the key issue for the self-defense theory, which was determining who pulled out a weapon first.  He argued Griffin would not have instigated the shootout because his new wife was with him

17

in the vehicle, and he would not have put her in danger.  And he told the jury that the victim firing first was consistent with acting in retaliation for defendant attempting to shoot up his home 10 days earlier, and with the victim's promise to defendant that the next time the victim saw Griffin, the victim would kill Griffin.

Ultimately, the record does not reveal an explanation for defense counsel's failure to object to the arguments.  Thus, the question is cognizable only on a habeas corpus, as part of a claim for ineffective assistance of counsel.  (*Dennis*, *supra*, 17 Cal.4th at p. 521.)

II

JURY INSTRUCTIONS

Griffin next argues jury instruction CALCRIM No. 224 uses language that improperly dichotomizes innocence from guilt.  He recognizes CALCRIM No. 224 is an approved jury instruction but maintains it is improper because its language violates due process and a fair trial.

The failure to object to a jury instruction forfeits the claim on appeal (see *People v. Souza* (2012) 54 Cal.4th 90, 120 (*Souza*)) unless the error implicates a defendant's substantial rights (§ 1259; see *People v. Carey* (2007) 41 Cal.4th 109, 129).  We review an alleged instructional error de novo to assess whether the instruction accurately states the law.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)  We consider whether an error in the instructions caused the jury to misapply the law (*People v. Lucas* (2014) 60 Cal.4th 153, 287), viewing it "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner" (*People v. Houston* (2012) 54 Cal.4th 1186, 1229).  "A trial court may properly reject an instruction proposed by the defendant if the instruction incorrectly states the law; is

18

argumentative, duplicative, or potentially confusing; or is not supported by substantial evidence.  [Citation.]"  (*People v. Zaragoza* (2016) 1 Cal.5th 21, 53 (*Zaragoza*).)

CALCRIM No. 224 provides in relevant part:  "If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence."

Griffin argues jurors would have approached the instructions with their common-sense understanding of the meaning of "innocence."  He maintains that a proper legal instruction would have replaced the word "innocence" with "a finding that guilt has not been proven," citing to *Zaragoza* as approving such a change in the language.

In *Zaragoza,* at the defendant's request, the court used a modified version of CALJIC No. 2.01, the predecessor to CALCRIM No. 224. (*Zaragoza*, *supra*, 1 Cal.5th at pp. 52-53.)  The issue there was whether the trial court erred by declining to use the defendant's requested pinpoint instruction, which attempted to link the instruction's principles to the defense's theory of the case.  (*Id.* at p. 53.)  The Supreme Court concluded there was no error because the requested pinpoint instruction was an incorrect statement of law.  (*Ibid*.)  It did not directly address the substance of the modified version of CALJIC No. 2.01; thus, *Zaragoza* is not particularly relevant.

However, the Third Appellate District addressed the language of CALJIC No. 2.01 in *People v. Wade* (1995) 39 Cal.App.4th 1487, 1493 (*Wade*). That instruction explained that if circumstantial evidence was susceptible to two reasonable interpretations, and one pointed to innocence and the other to guilt, the jury was required to adopt the interpretation that pointed to

innocence and to reject the interpretation pointing to guilt. (*Ibid.*) The defendant argued that characterizing the options as guilt and innocence undermined the burden of proof required by the prosecution. (*Ibid.*) The court of appeal disagreed: "To say that evidence 'points to' innocence does not suggest that a defendant has to prove his innocence. The language is used simply as a status of not guilty, a kind of compass or direction signal indicating where the evidence points." (*Ibid.*)

The appellate court noted that the jury instruction also included language that explained that " '[e]ach fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt.' " (*Wade, supra*, 39 Cal.App.4th at p. 1492, quoting CALJIC No. 2.01.) It explained that given that context, "no reasonable juror would apply the instruction in the manner suggested by defendant." (*Ibid.*)

*Wade* was cited with approval by our Supreme Court in *Crew.* In *Crew,* the defendant challenged four standard jury instructions that referred to "guilt or innocence," and the defendant argued such language "relieved the prosecution of its burden of proof by implying that the issue was one of guilt or *innocence* instead of whether there was or was not a reasonable doubt about defendant's guilt." (*Crew, supra*, 31 Cal.4th at p. 848.) But the Supreme Court concluded the word "innocence" in the jury instructions means "evidence less than that required to establish guilt, not [that] the defendant must establish innocence or that the prosecution has any burden other than proof beyond a reasonable doubt." (*Ibid.*)

The same is true here.  CALCRIM No. 224 opens by explaining that jurors must be convinced that the prosecution has "proved each fact essential to [a finding of guilt] beyond a reasonable doubt."  The next paragraph explains that in addition to determining that each fact essential to a guilty verdict has been proved beyond a reasonable doubt, the jury "must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty."  (CALCRIM No. 224.)  The inclusion of the word "innocence" does not lead us to conclude that the instruction has shifted the burden of proof.  Instead, the use of the word "innocence" simply means "less than that required to establish guilt."  (*Crew*, *supra*, 31 Cal.4th at p. 848.)

Furthermore, the prosecution's burden of proof beyond a reasonable doubt was repeated in several other jury instructions, including CALCRIM Nos. 505 (outlining the requirements for justifiable homicide via self-defense), 521 (addressing first degree murder), 570 (defining the requirements for heat of passion voluntary manslaughter), 571 (regarding imperfect self-defense voluntary manslaughter), 3146 and 3148 (detailing the requirements for a finding the defendant personally used a firearm), and 3470 (discussing self-defense).  The burden of proof was also emphasized throughout closing arguments by both attorneys, so there was no uncertainty regarding what was required.

As the Supreme Court noted, the use of the word "innocence" in the instruction does not make it inaccurate.  (*Crew*, *supra*, 31 Cal.4th at p. 848; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [bound by precedent].)  Thus, Griffin's substantial rights have not been implicated and his challenge has been forfeited.  (*Souza*, *supra*, 54 Cal.4th at p. 120.)

21

## III

## FINES, FEES, AND ASSESSMENTS

The Attorney General argues Griffin forfeited the right to request an ability-to-pay hearing because he did not object to the restitution fine. Although he mentions in his brief that a different result could be reached regarding the nonpunitive assessments, during oral argument, the attorney clarified that the matter did not need to be remanded because the issue of ability to pay regarding all fines, fees, and assessments had been forfeited. We agree with the Attorney General that Griffin's failure to object to the restitution fine forfeits the issue for appeal. (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1032-1033 (*Gutierrez*).)

Griffin had a statutory right to object to the imposition of the $10,000 restitution fine under section 1202.4, subdivision (c), and he also could have objected to the criminal administration fees, as the trial court pointed out in response to Griffin's informal motion for correction of fines and fees. Griffin's silence is a typical example of forfeiture. (See, e.g., *People v. Nelson* (2011) 51 Cal.4th 198, 227 [defendant forfeited his ability to challenge a restitution fine of $10,000 when he did not object at sentencing].) Because Griffin did not object to the $10,000 restitution fine or the $154 criminal administration fee, he would not have objected to the additional and much smaller $280 in fees and assessments.[5] (See *Gutierrez*, *supra*, 35 Cal.App.5th at p. 1033 ["As a practical matter, if [the defendant] chose not to object to a $10,000 restitution fine based on inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees."].) Therefore, we find Griffin has forfeited his right to challenge the fines, fees, and assessments on appeal.

---

[5]     Griffin stipulated to the $5,600 victim restitution at the sentencing hearing.

## DISPOSITION

The judgment is affirmed.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.